NOTICE
Decision filed 10/04/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210399-U

NO. 5-21-0399

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 21-CF-78 |
| | ) | |
| CHARLES E. WHITNEY, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1 *Held*: Defendant's conviction for aggravated battery of a correctional institution employee is affirmed where he failed to establish (1) the court erred when it allowed character evidence regarding the victim and (2) his attorney was acting under an actual conflict of interest. Moreover, any error by the trial court's allowance of evidence of other crimes, wrongs, or acts was harmless.

¶ 2 Following a jury trial, defendant, Charles E. Whitney, was convicted of aggravated battery of a correctional institution employee (720 ILCS 5/12-3.05(d)(4) (West 2020)) and was sentenced to 13 years' imprisonment. On appeal, defendant argues: (1) the trial court abused its discretion when it allowed the State to present evidence of other crimes, wrongs, or acts; (2) the court abused its discretion when it allowed the State to present character evidence of the victim; and (3) his trial counsel worked under an actual conflict of interest. For the following reasons, we affirm the jury's verdict.

1

¶ 3                         I. BACKGROUND

¶ 4                       A. The Information

¶ 5     On March 18, 2021, defendant was charged, by information, with two counts of aggravated battery. Count I alleged defendant knowingly caused great bodily harm to Justin Gibbs, a person he knew to be a correctional institution employee performing his official duties, in that he struck Justin Gibbs in the face, causing multiple nasal fractures, in violation of section 12-3.05(a)(3) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.05(a)(3) (West 2020)). Count II alleged defendant knowingly caused bodily harm to Justin Gibbs, a person he knew to be a correctional institution employee performing his official duties, in that he struck Justin Gibbs in the face, in violation of section 12-3.05(d)(4) of the Code (*id.* § 12-3.05(d)(4)).

¶ 6                         B. Pretrial

¶ 7     On July 19, 2021, the day before defendant's jury trial was set to start, the State filed a motion *in limine* seeking to introduce evidence of other crimes, wrongs, or acts pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). In particular, the State sought to introduce testimony about defendant's disciplinary violations which resulted in housing defendant in the lockdown unit of the jail. The motion maintained the evidence was probative to show *modus operandi*, intent, motive, opportunity, plan, and knowledge. At the hearing on the motion, the State argued the evidence was necessary to rebut defendant's self-defense claim and his possible testimony that he felt threatened by the number of officers who responded to the scene. Defense counsel argued the evidence disclosure was untimely. He further argued it was not being offered for a proper purpose, but rather was being offered to show that defendant acted in conformity with a specific character trait. Counsel opined that the disciplinary actions involved other inmates and not correctional employees. After hearing arguments of counsel, the trial court granted the State's motion.

¶ 8    The State also filed a motion *in limine* seeking, pursuant to Illinois Rule of Evidence 609, to impeach a possible defense witness, Larry Turner Jr., with three prior felony convictions should he testify. Ill. R. Evid. 609(a), (b) (eff. Jan. 1, 2011). The trial court granted the State's motion as it related to two of Mr. Turner's prior convictions.

¶ 9    During the hearing on this motion, defense counsel informed the trial court that in his previous position as state's attorney of Union County, his office prosecuted Mr. Turner on two of the cases the State was seeking to use. He stated both cases were handled by a different attorney in the office, he did not recall looking at the files, and he did not believe there was a conflict of interest in his current representation of defendant.

¶ 10                                C. Jury Trial

¶ 11    The jury trial commenced on July 20, 2021. In his opening statement, defense counsel asked the jury to listen to the evidence to decide whether they believed defendant acted in self-defense and whether Deputy Gibbs acted within his "lawful duty." He stated that Deputy Gibbs threatened defendant prior to the incident at issue at trial. Defense counsel further stated that Deputy Gibbs used his power to "keep my client in check" and that he treated defendant unfairly.

¶ 12    The State then presented its case-in-chief. It called Deputy Tim Williamson as its first witness. He testified that on March 17, 2021, defendant was an inmate in the Jackson County jail and was housed in H-Block, a unit where inmates were placed for disciplinary violations. Inmates in H-Block were allowed out of their cells one hour each day to engage in recreation, shower, and make phone calls. One of the inmate rules was that they return to their cells when ordered by an officer to do so. On this day, when Deputy Williamson ordered defendant to return to his cell after his hour had expired, defendant requested more time to take a shower and did not want to return to lock up. Deputy Williamson confirmed the log showed defendant was out of his cell for over

3

the allotted hour. Deputy Williamson again ordered defendant to return to his cell and defendant refused. A similar response was seen following the third order. Deputy Williamson then radioed for assistance and testified that due to defendant's "past history of violence, I knew that for me to approach him one-on-one would not be a very safe environment." He knew of allegations that defendant instigated fights with other inmates on two prior occasions. Deputy Williamson explained that when an officer requested assistance, all other available officers were generally supposed to respond as soon as possible. Although defendant was aware that other officers had been called, he continued to refuse to return to his cell. Deputy Williamson waited at the bottom of the stairwell for assistance to arrive while defendant was on the upper level, outside his cell.

¶ 13    Deputy Blake Bachmann and three other deputies arrived to assist him. After the other deputies arrived, all five went to the top level to speak with defendant. Deputy Bachmann ordered defendant to return to his cell. Defendant again refused, stating he wanted more time to take a shower. Defendant was informed that if he would go into his cell and lock up, he would be allowed an additional 10 minutes later, if time allowed after the other inmates had their hours out of their cells. Defendant continued to refuse to return to his cell and demanded more time to take a shower. At this time, defendant was standing in the threshold of his cell where the door could not be shut.

¶ 14    Deputy Justin Gibbs, Sergeant Weylin Wece, and Sergeant Greg Rowald arrived but waited at the bottom of the stairs. When defendant continued to refuse to return to his cell, they ascended to the top floor. Deputy Gibbs ordered defendant to step back into his cell but defendant refused to do so. Deputy Gibbs then placed his hand on defendant's chest and "kind of guided him back into the cell." Deputy Williamson stated it was not uncommon for an officer to place a hand on an inmate's chest and guide him when an inmate refused to return to his cell despite numerous orders from various officers. He further stated that he did not hear defendant state he was hurt as a result

4

of Deputy Gibbs placing his hand on defendant's chest. Thereafter, defendant swung his fist at Deputy Gibbs and hit him in the nose. The noise on impact was "one of the loudest pops" Deputy Williamson had ever heard. After the punch, defendant fully stepped back into his cell and "took a bladed stance" with his fists "up in an aggressive manner." Deputy Williamson then closed and locked defendant's cell door.

¶ 15    After securing defendant in his cell, Deputy Williamson saw that Deputy Gibbs was injured. Deputy Gibbs's nose was bleeding and he was holding onto the rail trying to keep himself from falling and hitting his head on the concrete. Deputy Williamson accompanied Deputy Gibbs to the nurse's station. Deputy Gibbs lost consciousness at least once and threw up a few times while his nose continued to bleed profusely. Deputy Gibbs identified video surveillance evidence of the incident between defendant and Deputy Gibbs, which he stated fairly and accurately depicted what transpired. The State moved to admit the video exhibits as evidence and the trial court granted the motion without objection.

¶ 16    Deputy Williamson testified that the first surveillance video showed a front view of the incident while the second video showed a side view. Deputy Williamson agreed the videos showed, *inter alia*, defendant arguing with Deputy Williamson, the first set of officers arriving and ascending the stairs, and the arrival of Deputy Gibbs, Deputy Bachmann, Sergeant Wece, and Sergeant Rowald. He indicated the video showed that after the first group of officers were unsuccessful in coaxing defendant back into his cell, Deputy Gibbs, Sergeant Wece, and Sergeant Rowald ascended the stairs. Deputy Williamson stated the videos depicted both Deputy Gibbs and Sergeant Wece walking up the stairway taking two steps at a time. It further depicted that once at the top of the stairs, Deputy Gibbs approached defendant and defendant then hit Deputy Gibbs. Deputy Williamson further testified that the video then showed that after being struck, Deputy

5

Gibbs "almost lost consciousness," and could not stand on his own, and had to be assisted down the stairs by other officers.

¶ 17   Deputy Williamson testified that the second video showed him confirming defendant's hour out of his cell was over and his ascending the stairs, taking them more than one step at a time. Deputy Williamson identified a photograph of Deputy Gibbs after he had been hit. He stated the photograph showed Deputy Gibbs was seriously injured, had been knocked back and "almost completely around" by the blow. Deputy Williamson identified a second photograph which showed officers realizing defendant had stepped back into his cell and Deputy Gibbs going backward from the force of the hit. Deputy Williamson identified a third photograph which he confirmed showed his securing the cell door and Deputy Gibbs appearing to lose consciousness. Deputy Williamson identified a fourth photograph which depicted Sergeant Wece attempting to grab Deputy Gibbs's hand to keep him from hitting his head on the concrete. Deputy Williamson identified a fifth photograph which showed Deputy Bachmann, Deputy Anderson, and Sergeant Wece helping Deputy Gibbs up from the floor.

¶ 18   On cross-examination, Deputy Williamson testified there was no hierarchy of command when an inmate refused to return to his cell. He explained that the first officer on the scene will attempt to get the inmate to return to the cell. If the inmate refuses, the officer will call for assistance. When another deputy arrives, if the first deputy is not making headway, that deputy will try to talk to the inmate. Deputy Williamson confirmed defendant requested a supervisor. He did not recall telling defendant he would get him one, but ultimately the supervisor, Sergeant Wece, responded to the call for assistance. When defense counsel showed Deputy Williamson a third view of the surveillance video, Deputy Williamson acknowledged that when Deputy Gibbs approached the scene, he moved the arms of two officers and also removed Deputy Williamson's

hand from the door. When questioned if it would be common for the deputy to walk past five officers, remove the hand of another officer from the door, and interject himself into the situation, Deputy Williamson answered that it would not be uncommon if the deputy had a good relationship with inmates and noted Deputy Williamson previously behaved similarly in another situation. Because defendant refused to comply with Deputy Williamson's orders, Deputy Williamson allowed Deputy Gibbs to take over. Deputy Williamson was unaware of any problems between Deputy Gibbs and defendant.

¶ 19    On redirect examination, Deputy Williamson clarified that Deputy Gibbs did not push defendant back into his cell. Deputy Gibbs's attempt to guide defendant into the cell had no effect as defendant did not go in and the cell door still could not be shut.

¶ 20    Deputy Blake Bachmann testified that on March 17, 2021, around 1:43 p.m., he was in H-Block conducting the security check. H-Block was the lockdown unit for inmates who either signed themselves into lockdown or who committed disciplinary violations while incarcerated. Inmates in H-Block were given one hour out of their cells each day to clean, take a shower, use the phone, and engage in recreation. At 1:43 p.m., he let defendant out of his cell for his hour. A log is kept tracking when an inmate leaves his cell. During the inmate's hour, the door to the cell is left open and the inmate may go in and out as he wishes. On this day, around 2:55 p.m., Deputy Bachmann asked Deputy Williamson to return defendant to his cell, over an hour after defendant had been let out. When Deputy Williamson radioed for assistance because defendant refused to return to his cell, Deputy Bachmann and other officers responded to the cell block.

¶ 21    When Deputy Bachmann arrived at the cell block, he observed Deputy Williamson attempting to return defendant to his cell and defendant's refusal. Defendant said he wanted more time for a shower. As the conversation progressed, defendant "got more and more agitated."

7

Deputy Bachmann also told defendant "several times" to lock up but he refused to do so. Deputy Bachmann told defendant he would be allowed out of his cell to take a shower later if there was time after the other inmates were given their time out of their cells. This did not appease defendant and he continued to refuse to lock up.

¶ 22    Deputy Gibbs, Sergeant Wece, and Sergeant Rowald arrived at the cell block and waited at the bottom of the stairs. Deputy Bachmann explained that Deputy Gibbs was a senior officer who had worked at the jail for over 10 years. He was also the commissary officer and had a good rapport with the inmates because he interacted with them throughout the day and helped them resolve issues with things such as commissary and phone usage. The three officers ascended the stairs. Because there is no hierarchy of officers regarding who can give orders when different levels of authority are present, any officer present could have ordered defendant to return to his cell. Both Deputy Gibbs and Sergeant Wece ordered defendant to return to his cell and he refused. At this point, five officers had ordered defendant to lock up to no avail. Deputy Bachmann explained that when an inmate refused verbal orders to return to his cell, officers would "increase our level of force" to physical force to get inmate compliance. The next level of force included placing a hand on the inmate's chest and guiding him back into his cell. Deputy Gibbs's hand placement on defendant's chest was "passive" and he "kind of guided [defendant] into the cell." Deputy Gibbs did not shove defendant. Defendant moved back a little bit, but not far enough for the cell door to be secured. While Deputy Gibbs was trying to walk defendant further into his cell, defendant "struck Deputy Gibbs in the face." Deputy Bachmann heard a "very loud pop" which indicated to him that a bone had been broken. After hitting Deputy Gibbs, defendant stepped back into his cell, "bladed his stance," and "had his fists clenched as one would do if as if they were about to engage in a fight." Once defendant stepped back, the cell door was closed and secured. At no time during

8

the incident did defendant complain about being in pain or that his ribs were hurting. Defendant's only stated reason for wanting more time out of his cell was that he wanted to take a shower. Deputy Bachmann's testimony regarding Deputy Gibbs's injuries following the altercation was similar to that of Deputy Williamson.

¶ 23    Later in the day, while Deputy Bachmann was conducting a security check, defendant stopped him. Defendant asked if would get an extra "dinner sack for cleaning Gibbs' clock" and then began laughing. Deputy Bachmann knew defendant was the one who made this statement because he could see defendant speaking through the viewing window of the cell.

¶ 24    On cross-examination, Deputy Bachmann testified that Deputy Gibbs, as the commissary officer, interacted a lot with inmates and was a very important person to them. Deputy Bachmann was unaware of the relationship between Deputy Gibbs and defendant. On the day of the incident, Deputy Gibbs's interjection into the situation where deputies were attempting to cajole defendant to return to his cell was not uncommon. It was common for a deputy to step in to help when other deputies had no success with an inmate refusing orders. Deputy Bachmann had stepped in front of other officers to take over with inmates on a number of occasions. In this instance, Deputy Gibbs gently guided defendant and defendant moved back a little bit. He did not push defendant with enough force for defendant to stumble.

¶ 25    Deputy Gibbs testified that he had been a deputy at the Jackson County jail for 13 years. He had assisted in the commissary beginning in 2009 and became the sole commissary officer in 2019. His role involved handling inmate-related needs related to ordering food, renting tablets, acquiring stamps, as well as a variety of other needs. He also handled grievances related to those issues. He generally had more contact with inmates than other deputies.

¶ 26   On March 17, 2021, Deputy Gibbs heard Officer Williamson request assistance due to defendant's refusal to return to his cell in H-Block. When an officer requested assistance, all available officers were to respond. H-Block was a lockdown unit where inmates were placed when they violated disciplinary rules. When he arrived at H-Block, Deputy Gibbs heard defendant say he wanted 10 more minutes out of his cell for a shower. Defendant presented no other reason. Since his hour had expired, defendant's request was denied. Deputy Gibbs heard Deputy Bachmann tell defendant he would be allowed out of his cell later if there was time after the other inmates got their hour out of their cells. Defendant was "agitated, emotional," and being loud and demanding.

¶ 27   When Deputy Gibbs saw defendant was not complying with the other officers' orders, he ascended the stairs to try to get defendant to return to his cell, passing other officers on his way. Deputy Gibbs thought he could convince defendant to return to his cell voluntarily because, as the commissary officer, he helped all the inmates out in "every way I can" and it was "a respect thing" resulting in their compliance with his orders. After defendant refused to comply with the various officers' orders to return to his cell, Deputy Gibbs asked defendant to lock down and assured him he would be allowed extra time out of his cell if there was time after the other inmates got their time out. When defendant refused to return to his cell, Deputy Gibbs placed his hand up to guide defendant back into his cell. He did not push defendant. While guiding him, Deputy Gibbs told him it would be alright and "we're going to do what we can to get you back out for your shower." Defendant then said, "I'm trying to talk," and immediately hit Deputy Gibbs in the face.

¶ 28   After being hit in the face, Deputy Gibbs became "lightheaded" and the next thing he recalled was waking up in the jail's medical room. He then began "throwing up blood and just repeatedly throwing up." Deputy Gibbs was transported by ambulance to the hospital. At the

hospital, it was determined that Deputy Gibbs had a broken facial bone, a broken nose, and a fractured orbital socket. After surgery on his nose, he returned to work on April 5, 2021, and was then placed on light duty. Around May 12, 2021, Deputy Gibbs returned to full duty. On the day of the trial, he was scheduled for an MRI because he was having recurring headaches. He indicated that further surgery might be needed.

¶ 29    On cross-examination, Deputy Gibbs testified that when he got up to defendant's cell, he calmly said to defendant, "Hey, just lock up, we'll try to get you back out of your cell if time allows." However, defendant continued to talk. Deputy Gibbs did not recall defendant saying that he was talking to Sergeant Wece.

¶ 30    Deputy Gibbs also testified that as the commissary officer, he never had any problems with inmates and he believed he had good rapport with defendant. Deputy Gibbs acknowledged defendant had filed grievances in the past when Deputy Gibbs told defendant that refunds were not given on tablet application rentals. Deputy Gibbs had no control over the policy pertaining to tablets.

¶ 31    In response to defense counsel's questioning him about an incident in February 2021, Deputy Gibbs testified that he was moving inmates at the time and was instructed to move Trevor Sawyers (Sawyers) in with defendant. Defendant expressed that he did not want Sawyers placed in his cell and that if Sawyers were placed in the cell, there would be a fight. Deputy Gibbs denied telling defendant he "was not so big and bad" and Deputy Gibbs could put another inmate, Brad Albertini, in his cell to "whoop his ass and keep him in line." He was not aware if another inmate, Larry Turner, was present at the time. Because defendant indicated he would hurt Sawyers, Deputy Gibbs did not put Sawyers in the cell with defendant.

11

¶ 32    On redirect examination, Deputy Gibbs confirmed he did not put Sawyers in a cell with defendant in February because defendant indicated a fight would ensue between the two of them. Additionally, regarding the March incident, a supervisor, such as Sergeant Wece, would have stopped Deputy Gibbs from intervening with defendant if he were overstepping his authority when he attempted to get defendant to return to his cell. On further examination by the State, Deputy Gibbs testified he did not treat defendant any differently than he treated other inmates.

¶ 33    Connie Falkenburry, a registered nurse at the Jackson County jail, testified that on March 17, 2021, around 3 o'clock, she assessed Deputy Gibbs who had been brought to her by two deputies who were assisting him. Deputy Gibbs was very pale, sweating, and bleeding from the nose. Falkenburry unsuccessfully tried to stop the bleeding by holding gauze tissue on the injury because she was unable to pinch Deputy Gibbs's nose due to it being flattened. The deputy was incoherent; he could not tell her what happened or where he was. While Falkenburry was assessing Deputy Gibbs, he lost consciousness for a few seconds. Based on Deputy Gibbs's appearance, his losing consciousness, and the displacement of his nose, Falkenburry believed he had a broken nose and possibly a concussion. Deputy Gibbs was taken by ambulance to the hospital.

¶ 34    Antonia Musgrave testified that she was a charge nurse who oversaw the emergency room at St. Joseph Memorial Hospital. On March 17, 2021, she was working in that capacity when Deputy Gibbs was brought to the emergency room. When Ms. Musgrave assessed Deputy Gibbs, she observed swelling around his nose and the nose appeared deviated or fractured. Deputy Gibbs was dazed and confused as to the time but knew where he was and why he was there. He underwent a CT scan which revealed multiple fractures to the nose and cheek, and a laceration on his face. Because of the injuries, the emergency doctor called an ear, nose, and throat specialist (ENT). In addition to the CT scan, Deputy Gibbs was given medication for pain and nausea.

¶ 35    On the third day of trial, defense counsel advised the court that Larry Turner Jr. was a key witness in the case. He stated that when he initially spoke to Mr. Turner, Mr. Turner indicated that he may have heard some of the exchange between defendant and Deputy Gibbs in late February 2021 when Deputy Gibbs was moving inmates. Mr. Turner wanted time to think about whether he was willing to testify. However, when defense counsel spoke with Mr. Turner the night before this day of trial, Mr. Turner became very angry. Defense counsel stated that he had been the state's attorney in Union County and previously an assistant state's attorney there, and "[W]hile I've been in the start of a few of his cases, [Mr. Turner] has pled with other State's Attorneys after I left that office, but [Mr. Turner] became very, very angry ***. He was screaming at me with expletives, you know, 'You sent me to prison,' a lot of expletives and hung up and would not answer again before they got him out of the room." Defense counsel spoke with defendant about the situation and defendant indicated he wished to ask the trial court for new counsel based on a conflict of interest. Defendant then asked for the trial court to appoint a new lawyer to represent him. He believed Mr. Turner had a "personal problem" with counsel and was refusing to cooperate due to that issue. The trial court denied defendant's request for new counsel. The trial court informed defendant that it could require Mr. Turner to come to court and be put on the stand to testify.

¶ 36    The State then called Sergeant Weylin Wece, a sergeant with the Jackson County Sheriff's Department, Jail Division to testify. Sergeant Wece testified that on March 17, 2021, he responded to an officer's request for assistance with an inmate in H-Block. That inmate was defendant. When Sergeant Wece arrived at the first floor of the cell block, defendant was not in his cell. Defendant was refusing orders from various officers to return to his cell. At that time, Sergeant Wece ordered defendant to lock up, but defendant refused. Sergeant Wece ascended the stairs along with Deputy Gibbs and Sergeant Rowald. When Sergeant Wece reached the top of the stairs, defendant told

13

him he needed more time out to take a shower. Sergeant Wece informed defendant that his allotted hour out of his cell had expired and defendant was to return to his cell. Defendant, who was agitated, continued to refuse Sergeant Wece's orders. Deputy Gibbs walked up and, using a soft open-hand touch, tried to guide defendant back into his cell. As he was guiding defendant, Deputy Gibbs told defendant, "Just go back in your cell, man. Just go back in your cell." Sergeant Wece testified that Deputy Gibbs was not exceeding his authority when he tried to reason with defendant. He explained that Deputy Gibbs had a rapport with inmates that allowed him to get inmates to comply peacefully and Deputy Gibbs was just doing his job at that time. Deputy Gibbs's use of his hand was not an aggressive move. At no time did defendant indicate that Deputy Gibbs's hand on his chest hurt. After Sergeant Wece saw defendant punch Deputy Gibbs, defendant "was posturing indicating he was ready to strike the next person who got directly in his path."

¶ 37    On cross-examination, Sergeant Wece acknowledged that although Deputy Gibbs had a good rapport with inmates generally, he did not have personal knowledge as to the relationship between defendant and Deputy Gibbs. On redirect examination, Sergeant Wece testified there was nothing defendant could have said that would have changed his mind that defendant was to lock up. Defendant's hour expired and, as a time management issue, he needed to lock up so that the other inmates could be let out of their cells for their time out. On recross-examination, Sergeant Wece indicated he did not know how many inmates still needed their time out when defendant was told to lock up.

¶ 38    Lieutenant Kyle Spradling testified that the regulations included the procedure for seeking medical treatment. Those requests were entered into the kiosk. The request went to a supervisor for review and were then forwarded to the nursing staff. A doctor came to the jail once weekly to see any inmates who need to be seen by a doctor. If the ailment was deemed by the nursing staff

14

to be an emergency that could not wait for a doctor's visit, the inmate was taken to the emergency room. Medical requests were kept in the inmate's medical file indefinitely.

¶ 39　Lieutenant Spradling identified a surveillance video recording of H-Block on March 17, 2021, from 1:43 p.m. until around 3 p.m. which was published to the jury. This recording showed defendant's actions during his hour out. Surveillance showed, *inter alia*, defendant doing nine pull-ups at around 2:34 p.m. and, at about 2:52 p.m., defendant doing three pull-ups.

¶ 40　Lieutenant Spradling also identified an excerpt of the officer policy manual that outlined the use of force policy. It provided, *inter alia*, that when dealing with an uncooperative inmate, the first use of force was the officer's presence. The second use of force was a verbal command or order and the next use of force was the use of a soft, open hand.

¶ 41　On cross-examination, Lieutenant Spradling testified that inmates were not given a written copy of the regulation and disciplinary code. Rather, they were informed it could be accessed on the kiosk. Lieutenant Spradling then outlined the process that occurred when a disciplinary violation occurred. If an inmate was disciplined, he might be given time to serve in H-Block. Defendant was disciplined for an incident that occurred February 15, 2021, and was sent to H-Block for 30 days, until March 16, 2021. Although defendant completed his 30 days, he remained in H-Block on the date of the incident involving Deputy Gibbs. Lieutenant Spradling acknowledged he reviewed the earlier admitted surveillance video by speeding it up. It showed defendant walking over to the telephones two or three times during his hour out of his cell on March 17, 2021.

¶ 42　On redirect examination, Lieutenant Spradling testified that if an inmate was sent to H-Block for a violation and committed another violation while in there, their time in H-Block could

be extended. The State rested. The defense moved for a directed verdict. The trial court denied the motion.

¶ 43    Following a recess, the trial court instructed the jail to bring Larry Turner Jr. to the courtroom. Once Mr. Turner was brought before the trial court, the trial court admonished him that he was under court order to testify. The trial court further admonished him that he was to answer questions to the best of his ability and to testify truthfully. Mr. Turner indicated that he understood and would testify truthfully. The jury returned to the courtroom and the defense called Mr. Turner as its first witness.

¶ 44    Mr. Turner testified he was currently incarcerated in the Illinois Department of Corrections. He was previously incarcerated in the Jackson County jail and was there in February 2021. He recalled a day in late February when Deputy Gibbs was moving him and Trevor Sawyers around to different cells due to problems in P-Block. He did not hear any conversation between defendant and Deputy Gibbs at that time. Defense counsel asked Mr. Turner if he understood he took an oath to tell the truth. Mr. Turner answered in the affirmative. Defense counsel then asked Mr. Turner if it was still his testimony that he did not hear any conversation between defendant and Deputy Gibbs. Mr. Turner answered, "Yeah, yes." No further questions were asked of Mr. Turner.

¶ 45    The defense next called Antonia Musgrave to testify. Ms. Musgrave testified she was the charge nurse who oversaw the emergency room at St. Joseph Memorial Hospital on December 27, 2020. She was working in that capacity when defendant was brought to the hospital after a reported altercation at the jail. In assessing defendant, she found he had injuries to his left upper chest and his right knee. He underwent a CT scan and x-rays which revealed "a couple rib fractures" to "the anterior third and fourth rib" which encompassed the mid-upper chest area. She stated that when someone had broken ribs, they were usually given anti-inflammatory medication such as Tylenol

16

and ibuprofen and instructed to put ice on the area, not engage in strenuous exercise, and use a pillow when coughing. She stated broken ribs healed in "less than a couple of months." A direct blow to the broken rib area within the six- to eight-week healing process would cause a problem, but as time went by, the injury was basically healed. After the healing time, unless there were a "massive direct blow on that area," the person would not be in a lot of pain.

¶ 46    On cross-examination, Ms. Musgrave testified the defendant's medical chart indicated that he was to use ice, take Tylenol or ibuprofen, refrain from strenuous exercise, and use a pillow for splinting. The defendant was prescribed Tylenol, which he was to take three times daily, on an as-needed basis, over a period of 10 days. She stated that if a person's broken ribs were not sufficiently healed, they would be in "a lot of pain" doing pull-ups.

¶ 47    Defendant recalled Connie Falkenburry to testify about an incident on January 8, 2021, when defendant sought treatment. She stated that while assessing defendant, he complained of chest pain. He stated he swallowed pills, choked, and heard a pop in his chest area where he had broken ribs.

¶ 48    On cross-examination, Ms. Falkenburry testified that shortly after defendant's trip to the emergency room in December 2020, he was seen by the jail physician for follow-up. The physician evaluated defendant and agreed the Tylenol, given by the hospital, was appropriate and defendant could take it three times daily. Defendant took Tylenol for about two weeks, then said he only wanted to use it when he needed it. After defendant's January 8, 2021, visit, Ms. Falkenburry saw defendant multiple times for various ailments, but defendant did not request any visits pertaining to his ribs.

¶ 49    Defendant testified he was arrested in Union County in the fall of 2020 and was housed in the Jackson County jail. He stated those charges were later dismissed and being in jail caused him

a lot of stress because he felt he should not have been there. He lost a lot due to the ordeal. The jail conditions were terrible. The jail was "loud" and smelled "like a port a potty," and he had to sleep on "a steel rack with a paper thin pad." Going through the healing process for broken ribs was difficult. It was "excruciatingly painful" to have broken ribs. After his rib injury, defendant was returned to the harsh jail conditions. He was not given any pillows or ice and he had to take his pills dry when the water was shut off. Defendant stated he had a bad coughing fit on January 8, 2021, less than two weeks after breaking his ribs. He felt like his "whole chest was on fire." The defendant told Deputy Partridge about the pain and the deputy took him to the nurse's office. He disputed that he quit asking for Tylenol and stated the officers quit giving it to him even though he was in pain.

¶ 50     Although the worst of the rib pain lasted three or four months, defendant's rib pain still bothered him at the time of trial, some seven months after the incident. After the emergency room visit, he was never taken for a follow-up visit. He did not ask for a follow-up visit because he did not have access to the kiosk for months to put in a sick slip. Defendant stated he was not advised to refrain from physical activity after the break. Even if it hurt, defendant worked out every day to stay fit. He would "work through the pain." On March 17, 2021, when the video captured him doing pull-ups, defendant was hurting although the pain was not as bad as when his ribs were first broken. He stated that he quit doing the pull-ups when he started hurting.

¶ 51     Defendant testified that he had an issue with a tablet he rented. The tablet rental was free, but the game applications were not. At this particular time, the tablet he rented would not let him log in after he had already purchased a couple of games. Defendant told Deputy Gibbs the problem and Deputy Gibbs said he would look into it. However, even though defendant told Deputy Gibbs day after day about the problem, Deputy Gibbs did nothing about it. As a result, defendant filed a

18

grievance and went through the grievance process. Deputy Gibbs sent him something indicating there were no refunds pertaining to tablets.

¶ 52    Defendant stated that Deputy Gibbs treated him differently than he treated the other inmates in that Deputy Gibbs got issues resolved for the others. He stated there were no dealings between him and Deputy Gibbs that would lead Deputy Gibbs to think they were friends. Defendant complained to other officers about Deputy Gibbs, with most of those complaints involving tablet issues. He stated that Deputy Gibbs would also make sarcastic comments to him and this treatment added to his stress.

¶ 53    In February 2021, officers were moving inmates around and Deputy Gibbs tried to put Sawyers in the cell with defendant. Defendant did not want Sawyers in his cell because Sawyers was a "loose cannon." He told Deputy Gibbs not to put Sawyers in his cell. In response, Deputy Gibbs said that if he wanted to put someone in defendant's cell with him, there was nothing defendant could do. Deputy Gibbs also told defendant that he "was not so big and bad" and could be "whooped." He told defendant he would put someone in his cell who would "whoop" him. Defendant took those comments seriously and considered them to be a direct threat.

¶ 54    On March 15, 2021, Mr. Turner told defendant that his stepfather died. On March 16, 2021, defendant was not let out of his cell and was "pretty much on lockdown." The water was also shut off as inmates had flooded cells.

¶ 55    On March 17, 2021, defendant was up early. He told officers he needed to get out of his cell to contact his family due to his stepfather's death. When he eventually got out for his hour, the telephones were not working. Defendant talked to some other inmates and checked the telephones a few times. Because the telephones were not working, defendant decided he would do something like work out or clean. Sometimes an inmate would get extra dinner bags for cleaning

19

the dayroom, so defendant did some cleaning. After a while, Deputy Williamson came around. Defendant lost track of time and told Deputy Williamson he did not think his hour was over. Defendant told Deputy Williamson that he had not been out in a couple days and needed more time to take a shower and use the telephone. Since Deputy Williamson did not seem to be helpful, defendant asked to speak to a supervisor. Deputy Williamson told him, "You want to talk with a sergeant, I'll get you a sergeant." Then he radioed that he was having problems with defendant and needed backup. Four or five other deputies arrived, and defendant told Deputy Bachmann he needed more time for a shower. The other deputies were all being respectful. Deputy Bachmann told defendant he would be let back out of his cell later if he would lock down. Defendant told Deputy Bachmann they both knew that he would not be let out later. Defendant then saw Deputy Gibbs, Sergeant Wece, and Sergeant Rowald ascending the stairs. He turned his attention to Sergeant Rowald since he was a sergeant. Sergeant Rowald told defendant Sergeant Wece was in charge that day, so he started talking to Sergeant Wece. Defendant stated that three deputies were loud and talking over him as he was talking to Sergeant Wece. He stated he spoke calmly the whole time in a monotone.

¶ 56    Defendant then saw Deputy Gibbs come toward him with his hand up. Deputy Gibbs said, "Come on, let's go," and started pushing him backward into his cell. Defendant was concerned because it was Deputy Gibbs coming towards him and he was "putting off [an] overall aggressive vibe." Deputy Gibbs put his hand directly on his chest where his ribs were broken and shoved him. Defendant stated the action hurt and "sent a sharp pain right through me." Defendant reacted by "bringing my left hand up and swept it away in one quick—it was controlled, but it was reactionary. It was a quick strike, and I stepped back and had my hands down at my side. And I looked, I assessed, and they weren't coming after me. There was no more immediate threat to deal

20

with. I stopped. I let them close the door, and they went on to deal with that. I had no more interaction with them until later on that day." At the moment defendant struck Deputy Gibbs, he felt he had to defend himself because there "was a direct threat. Not just a threat of violence or pain, but I was being put into direct pain."

¶ 57 Earlier that day, Deputy Bachmann told defendant he would give him an extra bag for cleaning. Defendant disputed telling Deputy Bachmann that he wanted an extra dinner sack for cleaning Deputy Gibbs's clock. He stated the inmate in the next cell was yelling something similar so defendant believed that was whom Deputy Bachmann heard. He stated that he did not intend to hurt anyone on March 17, 2021.

¶ 58 On cross-examination, defendant confirmed that he had another pending aggravated battery case at the time of trial that stemmed from an incident in the jail on December 27, 2020. On redirect examination, defendant testified the December 27 incident involved other inmates. Four inmates were charged with battering him and he was charged with battering one of the inmates. The defense rested.

¶ 59 In rebuttal, the State called Corporal Mike Stratton, a corporal with the Jackson County Sheriff's Department. Corporal Stratton testified that he reviewed the video of the December 27, 2020, altercation involving defendant and other inmates. Corporal Stratton stated that the video revealed defendant made the first physical contact in the altercation. Corporal Stratton sent his report to the state's attorney's office for possible charges to be filed.

¶ 60 On cross-examination, Corporal Stratton testified the video had no audio, so he did not hear any verbal remarks before the fight occurred. Defendant would be the only person in the courtroom who would have known what verbal remarks were made. On redirect examination,

21

Corporal Stratton acknowledged that others depicted in the video also would have heard any verbal exchange.

¶ 61    Closing arguments were presented the following day and the jury instructions were provided. The limiting instruction pertaining to other crimes, wrongs, or acts evidence read:

"Evidence has been received that the defendant has been involved in offenses or conduct other than those charged in the information. This evidence has been received on the issues of the defendant's intent, motive, or design and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in those offenses and conduct, and, if so, what weight should be given to others [*sic*] evidence on the issues of the other offenses and conduct."

¶ 62    After deliberation, the jury found defendant guilty of aggravated battery causing bodily harm to a correctional institution employee, but not guilty of aggravated battery causing great bodily harm.

¶ 63                                    D. Posttrial

¶ 64    On August 23, 2021, defendant filed his motion for judgment notwithstanding the verdict. He alleged the State failed to prove he was not acting in self-defense at the time of the incident with Deputy Gibbs. Defendant also filed a motion for new trial. He alleged the trial court erred in denying his motion for new counsel and in granting the State's motion *in limine* to admit other crimes, wrongs, or acts pursuant to Rule 404(b). The trial court denied both motions. The case then proceeded to sentencing on October 15, 2021. After hearing recommendations from the parties, the trial court sentenced defendant to 13 years' imprisonment in the Illinois Department of Corrections. Defendant now appeals.

¶ 65                                    II. ANALYSIS

¶ 66    On appeal, defendant argues that the trial court abused its discretion when it allowed the State to present evidence of other crimes, wrongs, or acts. He further argues that the trial court abused its discretion when it allowed the State to present character evidence of the victim, Deputy Gibbs. He lastly argues that his trial counsel worked under an actual conflict of interest.

¶ 67                        A. Evidence of Other Crimes, Wrongs, or Acts

¶ 68    Defendant first argues the trial court erred when it allowed the State to present evidence of his prior disciplinary violations for altercations in the jail with other inmates. "Evidence of other bad acts and/or crimes is not admissible to prove defendant's propensity to commit crimes." *People v. Crawford*, 2021 IL App (5th) 170496, ¶ 27. "Such evidence, however, is admissible where it is relevant for some purpose such as 'to show knowledge, intent, absence of mistake or accident, and absence of an innocent mind frame or the presence of criminal intent.' " *Id.* (quoting *People v. Jaynes*, 2014 IL App (5th) 120048, ¶ 55). "Even if other-act evidence is relevant, it must not become the focal point of the trial," because the "danger exists that evidence of other bad acts will persuade the jury to convict the defendant because it feels that the defendant is a bad person deserving of punishment." *Jaynes*, 2014 IL App (5th) 120048, ¶ 55. "A court therefore should exclude relevant other bad acts and crimes evidence where its prejudicial effect outweighs its probative value." *Crawford*, 2021 IL App (5th) 170496, ¶ 27.

¶ 69    The court's decision whether to admit other bad acts is reviewed for an abuse of discretion. *Id.* ¶ 28. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." We agree with defendant that the trial court abused its discretion when it allowed the State to present evidence of defendant's prior altercations with fellow inmates.

23

¶ 70    In this case, Deputy Williamson testified he called for assistance when defendant refused to return to his cell because of defendant's "past history of violence." He then acknowledged that he was aware defendant had been in two prior altercations with fellow inmates in which defendant allegedly was the first aggressor. Corporal Stratton testified to reviewing footage of an inmate fight from December 2020 in which defendant instigated the altercation. Contrary to the State's argument, we do not see how defendant's altercations with other inmates were relevant to his altercation with Deputy Gibbs other than to show defendant's propensity for violence.

¶ 71    Although we find the trial court erred when it allowed evidence of other bad acts, we find the error to be harmless. "The improper admission of evidence is harmless error if no reasonable probability exists that the verdict would have been different if the evidence at issue had been excluded." *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 65; see also *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (setting forth that the harmless error review standard for evidentiary issues is the "reasonable probability" standard, while the harmless error review standard for constitutional issues is the "beyond a reasonable doubt" standard). We conclude that the irrelevant evidence admitted was not a material factor in defendant's conviction and that no reasonable probability exists that the jury would have acquitted defendant absent the error. Moreover, we conclude that the court's evidentiary error would have been harmless even under the more restrictive "beyond a reasonable doubt" standard.

¶ 72    Here, there was a plethora of evidence, aside from the improperly admitted evidence, that defendant's actions were not in self-defense. All eyewitnesses testified that Deputy Gibbs did not use much force in placing his hand on defendant, an action that followed officers' regulations and procedures. Additionally, the surveillance video evidence which captured the altercation corroborated their testimonies.

¶ 73　We also disagree with defendant's argument that the jury's decision rested on a credibility contest. The evidence supporting the State's position went well beyond Deputy Gibbs's testimony. The State presented several eyewitnesses, as well as video evidence to support its case. It also presented medical testimony that refuted the defense's theory that defendant acted in self-defense based on the pain from Deputy Gibbs's pushing on his ribs. Therefore, we find the evidence to be overwhelming and any error harmless.

¶ 74　　　　　　　　　　　　B. Character Evidence

¶ 75　Defendant neither objected at trial when the trial court allowed character evidence regarding Deputy Gibbs to be presented nor included his contention that the trial court erred in a posttrial motion. "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. Forfeiture occurs when an error is not preserved. *People v. Schoonover*, 2021 IL 124832, ¶ 22. Thus, his argument is forfeited. Nonetheless, forfeiture may be excused under the plain error doctrine. *Sebby*, 2017 IL 119445, ¶ 48.

¶ 76　Whether a claim is reviewable as plain error is reviewed *de novo*. *Schoonover*, 2021 IL 124832, ¶ 26. "The plain error doctrine is applicable when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant (first-prong plain error) or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process (second-prong plain error)." *Id.* ¶ 27. Under either prong, we must first determine whether a clear or obvious error occurred. *People v. Long*, 2018 IL App (4th) 150919, ¶ 49. Here, defendant requested first-prong plain error review.

¶ 77    "When a theory of self-defense is raised in a battery or homicide case, evidence of the peaceful or violent character of either party is relevant as circumstantial evidence to show whether the complainant or the accused was the initial aggressor." *People v. Devine*, 199 Ill. App. 3d 1032, 1036 (1990). Illinois Rule of Evidence 404 provides:

> "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except *** [i]n a criminal case ***, evidence of a pertinent trait of character of the alleged victim offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide or battery case to rebut evidence that the alleged victim was the first aggressor." Ill. R. Evid. 404(a)(2) (eff. Jan. 1, 2011).

"However, while such character evidence is always relevant, it may not always be admissible." *Devine*, 199 Ill. App. 3d at 1036. "Because of the inflammatory nature of such evidence, it must first be determined whether the danger of undue prejudice outweighs the relevance of the evidence." *Id*. Our supreme court has stated:

> "The well-recognized and rational principle that the prosecution may put on reputation evidence to prove the victim's peaceful character if defendant has first attacked the victim's character for peacefulness [citation] must apply to the statements made in defendant's opening statement. To hold otherwise would enable the defendant to get away with using her opening statement to vilify the victim's character and thus poison the water without offering any supporting evidence. An evidentiary response from the State is appropriate under the circumstances. To hold otherwise would invite repetition of an improper practice

26

and would defeat the truth-seeking function of a trial." *People v. Whiters*, 146 Ill. 2d 437, 442-43 (1992).

¶ 78    In his opening statement, defense counsel painted Deputy Gibbs as one who mistreated and threatened defendant prior to the battery incident. The State's evidence that Deputy Gibbs had a good rapport with inmates in general was needed to rebut defendant's allegations that he would act in such a manner.

¶ 79    Moreover, the evidence was admissible for another reason. At trial, defendant also argued Deputy Gibbs acted beyond the scope of his position. The State's evidence of Deputy Gibbs's good rapport with inmates was necessary to rebut this argument. Numerous witnesses testified that because he had a good rapport with inmates, Deputy Gibbs stepped in to help when defendant refused to lock up. As borne out by their testimony, because there was no hierarchy under the circumstances, Deputy Gibbs's actions were not beyond his authority and were pursuant to regulations. Accordingly, the evidence was admissible to show why Deputy Gibbs believed he should intervene although he was not the most senior employee present.

¶ 80    Moreover, even if error were found, contrary to defendant's argument otherwise, the evidence was not closely balanced for the same reasons we found harmless error in the admission of defendant's prior altercations with other inmates. Evidence of defendant's guilt was overwhelming and we hold that defendant failed to show plain error.

¶ 81                                C. Conflict of Interest

¶ 82    Finally, defendant argues that the trial court erred when it denied his request to appoint new counsel. He avers an actual conflict of interest existed occasioned by trial counsel's prior prosecution of Mr. Turner and said conflict prevented counsel from investigating Mr. Turner, who defendant believed was critical to defendant's self-defense claim.

27

¶ 83    The question of whether a defendant was denied his right to effective assistance of counsel because of an actual conflict of interest is reviewed for an abuse of discretion. *People v. Moore*, 338 Ill. App. 3d 11, 16 (2003). Whether a conflict of interest exists must be evaluated on the specific facts of each case. *People v. Poole*, 2015 IL App (4th) 130847, ¶ 25. "A defendant may establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *People v. Morales*, 209 Ill. 2d 340, 348-49 (2004). "To do so, he must show 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict.' " *Id*. at 349 (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988)). "Speculative allegations and conclusory statements are not sufficient to establish that an actual conflict of interest affected counsel's performance." *Id.*

¶ 84    Here, Mr. Turner's testimony for the defense proved to be noneventful and was hardly critical to defendant's self-defense claim. He simply testified that he heard nothing said between Deputy Gibbs and defendant. Defense counsel reminded Mr. Turner of his duty to testify truthfully under penalty of perjury. Mr. Turner testified he understood such and maintained the veracity of his testimony. We do not see how trial counsel's prior employment in the Union County State's Attorney's Office when it previously prosecuted Mr. Turner adversely affected trial counsel's performance in this case, where defendant provided no evidence that Mr. Turner did not testify truthfully. Mr. Turner simply did not say what defendant hoped he would say. Moreover, there is no evidence that Mr. Turner would have testified differently had the court appointed defendant new counsel. Thus, we find that counsel's performance was not affected by any actual conflict of interest.

¶ 85                          III. CONCLUSION

¶ 86    For the foregoing reasons, we affirm defendant's conviction for aggravated battery of a correctional institution employee.

¶ 87    Affirmed.